**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>CARY EDWARD URICH,<br>Defendant. | Case No.<br>**COMPLAINT**<br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**SUMMARY**

1. Defendant Cary Edward Urich ("Defendant" or "Urich"), an investment adviser representative ("IAR") who was previously employed by investment advisory firm United Planners' Financial Services of America A LP ("United Planners"), owed his investment advisory clients fiduciary duties to, among other things, act in their best interest and provide full and fair disclosure of all material facts.

2. However, from April 2020 to November 2023 (the "Relevant Period"), Urich used his discretionary authority over the accounts of 54 of his investment advisory clients (the "Clients")—most of whom were elderly—to put large concentrations of their savings and retirement money into complex leveraged and/or inverse Exchange Traded Funds ("ETFs") that did not suit his Clients' investment profiles, objectives, or risk tolerances. Urich then held the leveraged and/or inverse ETFs in his Clients' accounts for extended periods of time. As a result, Urich violated his fiduciary duties in the following ways.

3. First, by investing a large concentration of his Clients' funds in these highly risky products, Urich disregarded the investment profiles, objectives, and risk tolerances of his Clients, none of whom were seeking speculative investments.

4. Second, Urich held these positions in his Clients' accounts for far longer than his Clients' investment objectives and risk tolerances warranted or the relevant guidance, prospectuses, and regulatory alerts recommended.

5. Third, Urich failed to disclose to his Clients that he held these positions in a manner inconsistent with the short-term holding period recommended in the guidance, prospectuses, and regulatory alerts that Urich himself reviewed and understood.

6. Finally, Urich failed to disclose to his Clients certain risks and negative historical returns associated with these investments.

7. As a result of Urich's violations of his fiduciary duties, his Clients suffered substantial losses over the Relevant Period.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action under Sections 209(d), 209(e), and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), 80b-9(e) & 80b-14].

9. Defendant, directly or indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10. Venue lies in this District pursuant to Section 214(a) of the Advisers Act [15 U.S.C. § 80b-14] because Urich resides in this District in Greer, South Carolina.

**THE DEFENDANT**

11. Cary Edward Urich, age 58, is a resident of Greer, South Carolina and worked as

an independent contractor for United Planners as an IAR and registered representative from September 2017 until December 2023. Since January 2024, Urich has worked as an independent contractor as an IAR and broker for a registered broker-dealer registered and its affiliated registered investment adviser, both located in New York. Urich currently holds FINRA series 4, 7, 63 and 65 registrations.

## RELATED PARTY

12. United Planners' Financial Services of America A LP is an Arizona limited partnership headquartered in Scottsdale, Arizona. United Planners has been registered with the Commission as a dually registered investment adviser and broker-dealer since 2000. According to its Form ADV Part 1 filed on June 18, 2026, United Planners has regulatory assets under management of $12.8 billion.

## FACTS

### I. Urich Was an Investment Adviser and Owed Fiduciary Duties to His Clients

13. During the Relevant Period, Urich was an IAR for United Planners, which was itself registered with the SEC as an investment adviser.

14. While United Planners was headquartered in Arizona, Urich worked as its IAR in his office in Greenville, South Carolina, and utilized United Planners' back-office functions including trading and clearing.

15. As an IAR, Urich engaged in the business of advising his Clients as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

16. As an IAR, Urich also had discretionary trading authority over his Clients' investment advisory accounts.

17. Urich received compensation for these advisory client services through his agreement with United Planners, which provided that Urich receive approximately 90% of the

management fees charged to and paid by clients.

18. Accordingly, during the Relevant Period, Urich was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. 80b-2(a)(11)], as he for compensation, engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

19. As an investment adviser, Urich owed fiduciary duties to his Clients. These duties included a duty to act in the best interest of Clients and a duty to provide full and fair disclosure of all material facts to his Clients.

## II. Urich Invested His Clients' Funds in Leveraged and/or Inverse ETFs for Extended Periods

20. During the Relevant Period, Urich heavily invested his Clients' funds, including their retirement funds, into five leveraged and/or inverse ETFs.

### A. Leveraged ETFs and Inverse ETFs

21. An ETF is a type of exchange-traded investment product that often tracks an index, sector, commodity, or other asset, and can be purchased or sold on a stock exchange.

22. Leveraged ETFs are different from, and riskier than, traditional ETFs in that they are structured to deliver multiples of the short-term (*e.g.*, daily) performance of the index or benchmark they track. In other words, in the event that the index or benchmark they track increases in value, then these leveraged ETFs increase multiples of that value.

23. Inverse ETFs are different from, and riskier than, traditional ETFs in that they are structured to deliver return performance that is the opposite of the short-term performance index or benchmark they track. In other words, in the event that the index or benchmark they track increases in value, then these inverse ETFs decrease in value. Conversely, in the event that the index or benchmark they track decreases in value, then these inverse ETFs increase in value.

**B. Urich's Clients Had Profiles, Risk Tolerances, and Objectives Inconsistent With Leveraged and/or Inverse ETFs**

24. As of 2020, the average age of Urich's Clients was 71.

25. All but one of Urich's Clients identified their risk tolerance as "moderate" or "moderately aggressive" (rather than "aggressive"), and every single Client identified his/her investment objective as "growth" or "growth & income" (rather than "speculation").

26. As such, Urich's Clients were not suited for the leveraged and/or inverse ETFs in which Urich invested.

**C. Urich Was Aware of the Risks Associated With Investing His Clients' Funds In Leveraged and/or Inverse ETFs For Long Periods**

27. During the Relevant Period, Urich invested his Clients' savings and retirement funds into the following five leveraged and/or inverse ETFs:

(a) Four leveraged and inverse ETFs—SDS, DXD, TWM, and QID—each of which sought two times the inverse performance of, respectively, the S&P 500, Dow Jones Industrial Average, Russell 2000, and Nasdaq-100 indexes; and

(b) One leveraged ETF—UVXY—which sought one-and one-half times the daily performance of the S&P 500 VIX Short-Term Futures index.

28. As of the end of 2020, 2021, and 2022, the five leveraged and/or inverse ETFs comprised 72%, 63%, and 58%, respectively, of the total market value of the Client accounts that Urich managed.

29. The prospectuses for each of the four leveraged and inverse ETFs cautioned against investing in the funds for longer than one day due to the heightened risks involved. Specifically, each of the four prospectuses—dating from 2016 to 2023—contained the following or nearly identical warning:

> The return of the Fund for periods longer than a single day will be the result of its return for each day compounded over the period. The Fund's returns for periods longer than a single day will very likely differ in amount, and possibly even direction, from the Fund's stated multiple (-2X) times the return of the Fund's Index for the same period. For periods longer than a single day, the Fund will lose money if the Index's performance is flat and it is possible that the Fund will lose money even if the level of Index falls. . . . Investors in the Fund should actively manage and monitor their investments, as frequently as daily. An investor in the Fund could potentially lose the full principal value of his/her investment within a single day . . . . The Fund does not seek to achieve its stated performance objective over a period of time greater than a single day.

(emphasis omitted).

30. Indeed, the prospectuses indicated that, from 2009 to 2017, the four leveraged and inverse ETFs had annual negative returns, up to -44%.

31. The prospectus for UVXY similarly cautioned against holding shares for more than a day. Specifically, the UVXY prospectus stated that:

(i) "[UVXY] uses leverage and is riskier than similarly benchmarked exchange-traded funds that do not use leverage;"
(ii) "Shareholders who invest in [UVXY] should actively manage and monitor their investments, as frequently as daily;"
(iii) "The use of leveraged positions could result in the total loss of an investor's investment within a single day;"
(iv) "[A]n investor . . . in the Fund could potentially lose the full principal value of his/her investment within a single day;" and
(v) "Investors holding Shares of the Fund beyond short-term periods have an increased risk of losing all or a substantial portion of their investment."

32. As with the four leveraged and inverse ETFs, the annual returns for UVXY were all negative during the Relevant Period.

33. Urich was aware of, read, and understood all of this cautionary guidance in the prospectuses prior to investing his Clients' funds in the leveraged and/or inverse ETFs.

34. Moreover, Urich kept in his own due diligence file regulatory notices, alerts, and statements from the SEC and FINRA from 2009 to 2023 regarding leveraged and/or inverse ETFs. These documents included the following warning regarding, among other things, the risk of

substantial losses if these products were held for too long:

(a) "Leveraged and inverse ETFs can deviate substantially from the performance of the underlying benchmark . . . . They are highly complex financial instruments that can turn into a minefield for buy-and-hold investors."

(b) Leveraged and inverse ETFs are "designed to achieve their stated performance objectives on a daily basis," and "performance of these ETFs over a period longer than one day . . . may expose investors to significant and sudden losses."

(c) "Due to the effect of compounding, their performance over longer periods of times (than one day) can differ significantly from the performance (or inverse of the performance) of their underlying index or benchmark during the same period of time."

(d) These negative effects of holding for longer than one day "can be magnified in volatile markets."

35. Urich was aware of, read, and understood all of these risks in the regulatory notices and alerts prior to investing his Clients' funds in the leveraged and/or inverse ETFs.

**D. Urich Invested His Clients' Funds In Leveraged and/or Inverse ETFs For An Average of 798 Days**

36. Despite knowing his Clients' investment objectives and risk tolerances, as well as the risks associated with investing in these leveraged and/or inverse ETFs, Urich invested high concentrations of their funds in these leveraged and/or inverse ETFs during the Relevant Period.

37. In addition, despite Urich's understanding of the risks, negative historical performance, and guidance associated with these leveraged and/or inverse ETFs, he did not disclose the same to his Clients.

38. Moreover, Urich caused his Clients to buy and hold these products for extended periods of time. Indeed, during the Relevant Period, Urich held the five leveraged and/or inverse

ETFs in Client accounts for an average of 798 days, resulting in substantial losses on those leveraged and/or inverse ETF positions across the 54 Client accounts.

39. For example, one of Urich's Clients ("E.P.") was 93 years old and retired in 2020. In E.P.'s opening account form, she made clear that her risk tolerance was "moderate," her objective was "growth & income," and her annual income as $100,000. Despite these preferences, Urich invested E.P. in all five of the aforementioned leveraged and/or inverse ETFs. In four of E.P.'s accounts, the leveraged and/or inverse ETFs were held for an average of 937 days, 476 days, 420 days, and 625 days, respectively. By the end of 2020, 2021, and 2022, her leveraged and/or inverse ETF positions comprised 74%, 63%, and 69%, respectively, of the total market value of E.P.'s accounts. Urich had E.P.'s accounts invest approximately $1,247,000 into these leveraged and/or inverse ETFs, and the accounts subsequently suffered losses of approximately $746,000 (60%) on those investments during the Relevant Period.

40. Another of Urich's clients ("W.S.") was 76 years old and retired in 2020. In W.S.'s opening account form, he made clear that his risk tolerance was "moderate," and his objective was "growth & income." Despite these preferences, Urich invested W.S. in three of the aforementioned leveraged and/or inverse ETFs (QIS, SDS, and UVXY), and held these products for an average of 382 days in W.S.'s account. By the end of 2020, his leveraged and/or inverse ETF positions comprised 83% of the total market value of his account. Urich had W.S.'s account invest approximately $351,000 into these leveraged and/or inverse ETFs. W.S. closed his account in 2021 after suffering losses of approximately $235,000 (67%) on those investments during the Relevant Period.

41. Another of Urich's clients ("C.E.") was 81 years old and retired in 2020. In C.E.'s opening account form, he made clear that his risk tolerance was "moderate," and his objective was

"growth & income." Despite these preferences, Urich invested C.E. in all five of the aforementioned leveraged and/or inverse ETFs. By the end of 2020, 2021, and 2022, the leveraged and/or inverse ETF positions comprised 80%, 91%, and 107% (due to a negative cash balance), respectively, of the total market value of C.E.'s accounts. The leveraged and/or inverse ETF positions were held for an average of 738 days and 733 days in C.E.'s two accounts. Urich had C.E.'s accounts invest approximately $462,000 into these leveraged and/or inverse ETFs, and the accounts subsequently realized losses of approximately $310,000 (67%) on those investments during the Relevant Period.

42. As a result of Urich's purchasing and holding these leveraged and/or inverse ETFs in his Clients' accounts, Urich's Clients lost—on average—approximately 70% of their investments.

## III. Urich Breached His Fiduciary Duties

### A. <u>Urich Failed to Act in the Best Interest of His Clients</u>

43. Urich's Clients were mostly elderly, had investment objectives of "growth" or "growth & income" rather than "speculation," and were uninformed of certain risks associated with holding the leveraged and/or inverse ETFs for extended periods of time.

44. As alleged above, Urich was aware of the risks associated with entering and holding these leveraged and/or inverse ETFs for extended periods of time.

45. Thus, by investing his Clients in the leveraged and/or inverse ETFs in a manner inconsistent with his Clients' investment objectives and risk tolerances, as well as the recommended short-term holding period outlined in the relevant guidance and prospectuses, Urich knowingly, or at least recklessly, failed to act in the best interests of his Client.

46. Urich also failed to exercise reasonable care or competence and failed to act in his Clients' best interests by investing his Clients into leveraged and/or inverse ETFs and holding such

positions for extended periods, contrary to the relevant guidance and to his Clients' investment objectives and risk tolerances.

**B. Urich Failed to Disclose Material Facts to His Clients**

47. Urich failed to disclose to his Clients that he would invest their money in leveraged and/or inverse ETFs for far longer and in higher concentrations than their investment objectives and risk tolerances warranted and far longer than the guidance, prospectuses, and regulatory alerts—which Urich himself had reviewed and understood—recommended.

48. Urich also failed to disclose to his Clients certain risks and negative historical returns associated with these leveraged and/or inverse ETFs before putting his Clients into these products and holding them for extended periods.

49. Urich's Clients and any reasonable person would have considered it important to their investment decisions to know that Urich was investing in and holding on to leveraged and/or inverse ETFs for far longer than their investment objectives and risk tolerances warranted, and far longer than the relevant prospectus or guidance recommended.

50. Urich's Clients and any reasonable person would have considered it important to their investment decisions to know the risks and negative historical returns associated with these leveraged and/or inverse ETFs before investing in these products and holding them for extended periods.

51. Accordingly, Urich knowingly, or at least recklessly, breached his duty to make full and fair disclosure to his Clients of all material facts.

52. Urich also failed to exercise reasonable care or competence in failing to make full and fair disclosure to his Clients of all material facts.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Fraud by an Investment Adviser**
**206(1) of the Advisers Act**

53. The SEC realleges and incorporates by reference paragraphs 1 through 52 above.

54. At all relevant times, Urich was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

55. In connection with investing his Clients in leveraged and/or inverse ETFs and holding those positions for longer than his Clients' objectives and risk tolerances warranted and longer than recommended by the relevant guidance and prospectuses, as detailed above, Urich, while acting as an investment adviser, by the use of the mails or any means or instrumentalities of interstate commerce, directly or indirectly with scienter, employed devices, schemes, or artifices to defraud clients or prospective clients.

56. By engaging in the conduct described above, Urich has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

**<u>SECOND CLAIM FOR RELIEF</u>**
**Fraud by an Investment Adviser**
**206(2) of the Advisers Act**

57. The SEC realleges and incorporates by reference paragraphs 1 through 52 above.

58. At all relevant times, Urich was an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

59. In connection with investing his Clients in leveraged and/or inverse ETFs and holding those positions for longer than his Clients' objectives and risk tolerances warranted and longer than recommended by the relevant guidance and prospectuses, as detailed above, Urich, while acting as an investment adviser, by the use of the mails or any means or instrumentalities of interstate commerce, at least negligently, directly or indirectly engaged in transactions, practices,

or courses of business which operated as a fraud or deceit upon clients or prospective clients.

60. By engaging in the conduct described above, Urich has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendant committed the alleged violations;

**II.**

Issue a Final Judgment, in the form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Urich, his officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with him, directly or indirectly, from violating Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. § 80b-6(1) and (2);

**II.**

Enter an Order, pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] and Section 21(d)(5) of the Securities Exchange Act of 1934 [15 U.S.C. § 78u(d)(5)], permanently enjoining Urich, for two years following the date of entry of the Final Judgment, from directly or indirectly, acting as or being associated with any investment adviser. For purposes of the injunction, a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser;

**III.**

Order Urich to pay civil penalties under Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e);

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**V.**

Grant such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

The SEC demands a trial by jury on all issues so triable.

Dated: October 29, 2026

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By: *s/Robert Sneed*
ROBERT SNEED (#7437)
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone: (864) 283-2100
Email: Robert.sneed@usdoj.gov
*Attorney for the United States of America*

Daniel S. Lim
SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Email: LimDa@sec.gov
*Attorneys for the Securities and Exchange Commission*